STATE OF MISSOURI, RESPONDENT, v. A. W. COPPERSMITH, APPELLANT.—105 S. W. (2d) 991.

Kansas City Court of Appeals.  May 24, 1937.

*E. L. Redman* for the State.

*Edward G. Robison* and *Charles E. Gibbany* for appellant.

CAMPBELL, C.—The defendant was charged by information with the crime of receiving stolen property, namely, "one double set of work harness," the property of John Evans, knowing it had been stolen. Trial with a jury resulted in a verdict of guilty, punishment assessed at $75 and imprisonment in the county jail for a period of three months. The defendant's motion for new trial, timely filed, was overruled and sentence imposed in accordance with the verdict of the jury. The defendant has appealed.

The defendant contends the court erred in refusing his instructions, which would have directed a verdict of acquittal, for the reason that there was no evidence tending to show the defendant was guilty as charged. In view of this contention it is necessary to detail the entire testimony.

John Evans testified he lived in Stanberry, had known the defendant for ten years or more; that the defendant had an apartment in his office building about one-half block north of the square in Stanberry; that he saw the harness in his barn on Sunday, September 8, 1935, and that the harness was taken between that time and the morning of the next day.

"Q. Mr. Evans, tell the jury what you did on the evening of September 8th—Sunday evening? A. We went hunting.

"Q. Tell who we are? A. Otis Sego—Ernest Sego, I mean and Estol Wilson with some dogs.

"Q. Take your time and tell about it? A. We went over and went down south of town to the black top—the end of the black top and we went hunting—took some dogs and it set in to raining and we came back to the road. We was probably gone twenty-five or thirty minutes—not very far from the road to where he was.

"Q. Were you making the arrangements to go hunting? A. They came by for me.

"Q. Who are they? A. Estol and Ernest Sego.

"Q. When did you first see Mr. Crail? A. When I went to get in the car was the first time I seen him.

"Q. Where was the rest of the family? A. Two of the girls went to the show and the two little girls to Frank Crail's.

"Q. From the time you got to Crails you learned Frank was going to take you in the car? A. Yes, sir.

"Q. And you went south to the black top? A. Yes, sir.

"Q. How far from town? A. Three and a half or four miles.

"Q. What happened to Mr. Crail? A. He turned around and came back to town. He never said anything to me. He just turned around and came back to town.

"Q. I will ask if shortly after you got out there it commenced misting rain? A. Yes.

"Q. And whether or not shortly after it was raining hard? A. It did.

"Q. What did you do after it commenced to rain? A. Came to the highway.

"Q. Which way? A. Toward town and we got over the cement bridge and waited until it slackened and we got out on the highway and he came.

"Q. Frank Crail? A. Yes, Frank Crail.

"Q. I will ask you to state whether or not, to your knowledge, the defendant Mr. Coppersmith is acquainted with Frank Crail? A. Yes, he is.

"Q. What is the relationship? A. He worked out for Doc's sister and worked for him in town.

"Q. And what has been their relationship since that time? A. Of course I don't know since that time.

"Q. I will ask whether the defendant and Frank Crail's family visit back and forth? A. Yes, I think they do quite often."

The witness further testified the office and apartment of the defendant was searched under a search warrant and the harness was not found; that the defendant at that time said that he did not "use any" harness; that in two or three days thereafter another search warrant was obtained in virtue of which a garage belonging to Charles Dollars was searched, the harness found in a V-8 automobile covered with paper, a sack and a cushion; that defendant was brought to the garage by the sheriff and then stated that he owned the automobile, had owned it about a year or a little longer, had a wreck near "St. Joseph on Thanksgiving Day a year ago;" that he rented the garage from Dollars, and that he did not have title to the automobile; that he had the automobile on trial, "got it from some fellow in Nebraska" whom he did not know.

"Q. Tell what he did and how he acted that afternoon? A. He acted like he was awful uneasy and nervous.

"Q. Tell whether he was hesitant about speaking? A. He was.

The witness on cross-examination testified that he, "Estol Wilson and Sego" went hunting with dogs on the evening of September 8, 1935.

"Q. When were you to meet? A. Came by my place.

"Q. It was Crail's car that was used to take you on this trip? A. Yes, sir. . . .

"Q. Crail didn't have any dogs? A. No.

"Q. Or go on the hunt? A. No, sir.

"Q. Drove how far on the highway? A. Three and a half or four miles.

"Q. South of Stanberry? A. Yes, sir.

"Q. You three got out and went hunting? A. Yes.

"Q. How long were you gone? A. Thirty minutes.

"Q. Crail came back and got you? A. Yes, sir.

"Q. You don't know who made the arrangements about taking the car? A. No, sir.

"Q. You just know he turned around and came back for you? A. Yes.

"Q. And you got in the culvert and finally Crail came along and hauled you three men in ? A. Two and me.

"Q. You think that was in September? A. That was September 8th."

The witness further testified that the harness was missing on the morning after he went hunting; that the defendant had a dental office and also had rooms in the same building; that he went to that building when the officers served the search warrant, and that the defendant knew they were looking for harness; that about four days later under another search warrant the Dollars' garage was searched;

that key to the garage was obtained from Dollars who used a part of the garage as a coal bin and a toilet; that the car was in one space of the garage and that there was no wall or division in the building; that the automobile, a Ford coupe, had been wrecked, and that its doors were not locked; that the harness was "stuffed" in a compartment in the automobile covered by a cushion; that when the harness was found the sheriff brought the defendant to the garage, asked him if he knew anything about the harness, and he said he did not.

The witness on re-direct examination said:

"Q. Mr. Evans, what, if anything, did the defendant say about what became of the radiator of the car? A. Gave it to Frank Crail. . . .

"Q. Mr. Evans, is Frank Crail here in the Court Room? A. Yes, sir."

In re-cross examination is the following:

"Q. The Prosecuting Attorney had him subpoenaed? A. I don't know.

"Q. I say you had him subpoenaed? A. No, I didn't." (A subpoena disclosed that Crail was subpoenaed by the State.)"

Mrs. Dollars testified she lived in Stanberry and had a garage separate from her dwelling house; that she rented the garage to the defendant in August or September, 1934; that she had not seen the defendant about the garage for "quite awhile" prior to the service of the search warrant; that it must have "been two weeks or more," I don't know whether he went to the garage or not;" that the garage had one door on the east, "a wide opening;" that so far as she knew the defendant kept that door fastened; that there was a south entrance which was kept locked with a Yale lock, to which the defendant had a key; that she had nothing to do with the automobile that was parked in the building; that she and the defendant did not go in at the same door, and that during all of the time she and the defendant had joint use of the garage; that she tried to keep the garage locked, but that she thought she had failed to do so on a few occasions; that there were windows in the garage building which would slide back and forth from either the inside or outside; and the openings were "big enough to get in there:" that the wrecked automobile was standing in the garage for about one year prior to the service of the search warrant; and that she thought the defendant tore up the automobile while she was away from home the previous summer.

David Harrison, a member of the State Highway Patrol, stationed at St. Joseph, testified that it was a part of his duties to investigate and determine title to motor vehicles; that in September or October, 1935, he asked the defendant if he had title to the car and that defendant in reply said, "he didn't have; he was trying it out, think-

ing about buying it and he said this fellow he was buying it from came over once or twice a month and I asked what he was going to pay for it and he said Three Hundred Dollars ($300.00) and I asked who he was and he said Tom Hurd, from Princeton, Missouri, a farmer, and I told him if he was unable to produce a deed he was going to take it in our possession until someone proved the ownership.

"Q. What did you do about it?  A. Had it pulled into the Chevrolet Garage at Stanberry, Missouri.

"Q. Did you impound it for investigation?  A. Yes.

"Q. I will ask if you made an investigation to determine the source of title?  A. Yes, we have traced it down as far as Marysville, Kansas, to a fellow by the name of Ray Smith and we have not been able to locate him yet.

"Q. I will ask if it was registered in this State?  A. No, sir."

Dan Pierce, marshal of Stanberry, testified that he was acquainted with the defendant and with John Evans, was present when the defendant's office was searched, and found some socket wrenches.

"Q. I will ask you if you had a request to be on the lookout for them?  A. I did. . . .

"Q. What did he (defendant) say about them?  A. He said he let Frank Crail have some money on them—I believe Two Dollars, or Two and a half dollars, and he had left them there for security.

"Q. You know Frank Crail, do you not, Mr. Pierce?  A. Yes, sir.

"Q. How long has he been in and around Stanberry?  A. I expect eleven or twelve years, that I know of.

"Q. Do you know his general reputation as to being slippery or outside of the law?"

The defendant's objection to the question was sustained. This was all the evidence offered on the part of the State.

The defendant testified in his own behalf. It is not claimed, nor could it well be claimed, that he gave any testimony which would tend to aid the prosecution, and inasmuch as we have arrived at the conclusion that there was no evidence showing guilt on the part of the defendant, it is unnecessary to detail his testimony.

In the foregoing statement the questions and answers referring directly or indirectly to Frank Crail are quoted. This for the reason that the prosecution in the trial proceeded upon the theory that Crail stole the harness, and that defendant received the harness from Crail knowing that the latter was the thief. The sum of the evidence concerning Crail is that on the night the harness was stolen he transported Evans and other hunters into the country; that after rain fell he returned to the country, found the hunters and brought them into town; that on that occasion Crail did not speak to Evans nor did the latter, so far as the evidence shows, speak to

the former; that the defendant when his office was searched said that he had loaned two or two and a half dollars to Crail on some wrenches which were found in the office; that he gave part of the automobile to Crail, and that Crail had worked for the defendant and for the defendant's sister. Manifestly there is not one word of testimony tending to show that Crail stole the harness. The fact that he took the hunters into the country, returned for them, did not speak to Evans, had borrowed a small sum of money from the defendant, pledged wrenches as security, had received a part of the wrecked automobile, does not in the remotest sort of way tend to prove that he stole the harness.

Of course if the defendant received the harness knowing it had been stolen, the name of the person from whom he received it is of no consequence. Although the State does not claim there is any evidence showing that the defendant received the harness from any one except Crail, we have nevertheless carefully read the record and do not find any evidence tending to show that the defendant received the harness knowing it had been stolen.

The automobile, if such it may be called, had been parked in the garage for about one year prior to the larceny. The defendant was not in the exclusive possession of the automobile and garage, hence the fact that the harness was found in the automobile was not sufficient to show that the defendant stole the harness. [State v. Castor, 93 Mo. 242.] The defendant, however, is not charged with stealing the harness. He is charged with receiving the harness, knowing it to have been stolen.

The Supreme Court has ruled that a person who steals property cannot be convicted of receiving such property knowing it to have been stolen. [State v. Honig, 78 Mo. 249.] And that possession of stolen goods is no evidence that the accused received them knowing they were stolen. [State v. Bulla, 89 Mo. 595; State v. Richmond, 186 Mo. 81; State v. Speridin, 191 Mo. 24.]

The evidence utterly fails to prove that the defendant is guilty of the offense charged in the information. [State v. Spires, 65 S. W. (2d) 1057.]

The judgment is reversed and the defendant discharged. *Sperry, C.,* concurs.

PER CURIAM:—The foregoing opinion of CAMPBELL, C., is adopted as the opinion of the court. The judgment is reversed and the defendant discharged. All concur.